GEORGE B. MINSHULL, PLAINTIFF IN ERROR, v. NEW JERSEY TERMINAL RAILROAD COMPANY, DEFENDANT IN ERROR.

Submitted July 7, 1908—Decided November 16, 1908.

The plaintiff, who was employed by the defendant at a stated salary, testified that he was induced to decline a higher salary offered by another railroad, and to remain in the service of the defendant, by a promise made by its president that if he remained until the road was sold, he should have two per. cent. of its bonds and $25,000 worth of its stock. The defendant owned no stock or bonds at the time. This promise never received the assent of the executive committee nor of the board of directors, but instead, a modified proposition was made to the plaintiff by some of the directors, which he refused to accept. The road was thereafter sold, and thereby the plaintiff's services ended. His salary under his old contract was paid. In an action against the railroad company for breach of a contract to deliver the bonds and stock— *Held*, (1) that the president had no authority as such to make the alleged promise, and in the absence of any ratification of it by the directors it did not bind the defending company. *Held*, (2) that there could be no recovery on a *quantum meruit* because the old contract remained in force, not having been rescinded by a subsequent agreement.

On error to the Supreme Court.

For the plaintiff in error, *C. Frank Kireker* and *John B. Humphreys.*

For the defendant in error, *Gilbert Collins.*

The opinion of the court was delivered by

REED, J.   This writ of error brings up a judgment of nonsuit.   It appears that Mr. Minshull, the plaintiff, had been employed by the New Jersey Terminal Railroad Company at a salary of $175 a month.   In July, 1905, he received an offer from the Lehigh Valley Railroad Company to enter its services at a salary of $200 a month.   He spoke to Mr. Savage, the president of the defendant company about this offer, and told him that he, Minshull, would refuse the offer of the Lehigh Valley Railroad Company, and remain in the service of the defendant until the latter sold its road, if the defendant, in addition to his then salary, would give him two per cent. of its bonds and $25,000 par value of its stock.

Mr. Minshull testified that Mr. Savage told him that he would let him know in a day or two, and that Mr. Savage afterward told him that his offer was accepted and that when the Messrs. Corbin, who were then away on their vacation, returned, the necessary bonds and stock would be provided for.

It is to be observed that all the stock of the defending company was already issued and owned by ten persons, and all the bonds had also been issued.

After the conversation with Mr. Savage, the plaintiff remained in the service of the defendant until July, 1905, when the control of the New Jersey Terminal Company was sold to the Central Railroad of New Jersey.   This sale terminated the services of the plaintiff.   His salary of $175 a month has been paid.   The two per cent. of the bonds, and the $25,000 worth of stock has never been delivered to the plaintiff.   This action was brought for the breach of the alleged contract to deliver to plaintiff the stock and bonds just mentioned.

That the plaintiff cannot stand upon his conversation with Mr. Savage, the president of the defending company, to estab-

lish a contract with the company, seems manifest. The president was invested with no authority to bargain that the company should go into the market and buy stocks and bonds for the purpose of paying an increased compensation to one of the company's servants. Indeed the plaintiff does not put his case upon the existence of any such authority in the president. His point is that the executive committee, or the directors of the New Jersey Terminal Company, acquiesced in the bargain entered into by the president, and in this manner bound the corporation to its fulfillment.

The executive committee consisted of Mr. Savage, Mr. William H. and Mr. Charles L. Corbin.

Mr. Minshull admits that he never had any conversation concerning this bargain with Mr. Charles L. Corbin.

Respecting his connection with Mr. W. H. Corbin it appears conclusively that the latter was never informed by Minshull of the terms upon which, as he claims, Savage promised to retain him; and if Mr. W. H. Corbin learned of these terms from any other source, it conclusively appears that he never assented to them.

It does appear that on August 8th, 1904, Mr. Savage wrote to Mr. W. H. Corbin concerning the offer made to Minshull, and said: "I think Minshull would be willing to stay at the same salary, with at least two per cent. of the bonds, and such proportion of the stock as we may agree upon. I rather imagine he wants $25,000." To this letter Mr. Corbin replied, fixing a meeting at Jersey City for the next Friday. The first meeting between Mr. W. H. Corbin and Minshull was at Jersey City. Mr. Minshull says that Mr. Corbin said to him at that meeting that he "thought they would be able to do as well by him as the Lehigh Valley Railroad Company, or anyone else." Minshull says: "I told them that was something that had already been settled between the president and myself, and that the offer of the Lehigh Valley Railroad Company had been declined." He says, "Mr. Corbin assured me that in his judgment I had made no mistake in staying with the terminal company, and handed me a draft of an agreement, and requested that I look it over, and if it was entirely

satisfactory, to hand it to Mr. Savage." This paper was the draft of a contract between Minshull on the one hand, and Mr. Savage and four others on the other hand. It purported to bind Minshull to remain in the service of the company for five years. In addition to the salary then paid by the terminal company it was to deposit with a trust company $5,000 in bonds at par and $20,000 in par value of stock. Each year of the five-year period the trust company was to deliver to Minshull one thousand dollar bond and certificates of shares of stock of par value of $4,000. This was the only agreement to which Mr. Corbin had thus far indicated his willingness to give his approval.

This paper was not satisfactory to Mr. Minshull and thereafter the terms of this writing were slightly modified by a second writing which was also unsatisfactory to the plaintiff; so when the road was sold out in July, 1905, there had been no contract entered into between Minshull and the executive committee, because so far as concerned the Messrs. Corbin, no terms had been agreed upon, and they constituted a majority of the committee.

What is true of Minshull's relations with the executive committee is also true of his relations with the board of directors. This board consisted of the members of the executive committee and four others. Two of these four knew of the negotiations with Minshull, and one of them, Mr. Houston, signed the second paper which was drafted, but, as already stated, was never accepted by Mr. Minshull. The other two of the four directors, so far as appears, had no knowledge of the negotiations. From these facts it appears that no right of action for a breach or of any specfic contract exists in favor of the plaintiff. Nor is it perceived upon what ground he can sustain his alleged right to recover on a *quantum meruit*. The contract existing between Mr. Minshull and the defendant in July, 1904, was that he was to receive $175 a month for his services. There was not a moment from this date until Mr. Minshull left the company's employ in July, 1905, that he was not entitled to recover this amount. The railroad company could not claim that he was bound to receive less than $175 a month,

although a jury might find that his services were worth less. This situation exists because the contract under which Minshull had been serving previous to July, 1904, was in no way rescinded. The rights of both parties were measured by its terms until that contract ceased to exist. It continued to exist unless a substituted contract took its place and thus ended it. But the promise of Mr. Savage, if made, being beyond his authority to bind the defendant, and being never ratified by it, the negotiations between the parties never became a new contract, and so the old contract remains in force until the end of the plaintiff's services.

There was no error in directing a nonsuit.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J.    16.

*For reversal*—None.